**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                                                                                          **No. CR  00-410 JP**

**MELVIN NELSON,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

At a July 5, 2000 hearing on Defendant's Motion to Suppress Evidence, filed June 9, 2000, (Doc. No. 44), Defendant was present and represented by Thomas B. Jameson; Larry Gomez represented the Government.  Having carefully reviewed the briefs, the evidence, and the applicable law, I conclude that the motion should be denied.

## BACKGROUND

At the hearing, Fernando Andrade and Officer Andy Gutierrez testified.  The testimony established the following facts.

Mr. Andrade works for the Pojoaque Pueblo Security Company ("PPSC").  (Tr. at 7.) His job title or rank is Sergeant.  (Tr. at 9.)  He wears a uniform with a "security shield" emblem and a United States flag patch.  (Id.)  Mr. Andrade carries a gun and handcuffs.  (Id.)  He has not been trained by a law enforcement agency or official.  (Tr. at 8.)  Law enforcement does not direct his actions.  (Tr. at 9.)  Mr. Andrade is not deputized or cross-deputized.  (Tr. at 18.)

PPSC provides security services for certain Pojoaque Pueblo enterprises, including the

Pojoaque Pueblo casino and sports bar. (Tr. at 8.) PPSC's mission is to secure and protect the people and assets of the Pueblo. (Id.) One of Mr. Andrade's roles in fulfilling that mission is to prevent intoxicated patrons from driving. (Tr. at 19, 23-24). The PPSC security chief advises its employees to call tribal police if a drunk casino customer refuses requests not to drive. (Tr. at 19.) PPSC does not have an agreement with Pojoaque Pueblo Police. (Id.)

On or about March 13, 2000 Mr. Andrade was on duty inside the sports bar when Defendant entered. (Tr. at 10.)[1] Mr. Andrade was positioned at a security station near the bar entrance, from which he could see a bank of public pay phones. (Tr. at 11.) As Defendant passed the security station, Mr. Andrade saw him stumbling and struggling to maintain his balance. (Id.) Mr. Andrade believed Defendant was intoxicated. (Id.)

Defendant first went to a pay phone and sat down. (Id.) A minute or two later Defendant motioned to Mr. Andrade for assistance. (Tr. at 12.) When he reached Defendant, Mr. Andrade noticed a strong smell of alcohol. (Id.) Defendant told Mr. Andrade that he needed help dialing a phone number. (Id.) As Defendant spoke, Mr. Andrade noticed that Defendant slurred his words. (Id.) Mr. Andrade helped Defendant place a long-distance call to the Española area. (Tr. 13, 21.) When the phone on the other end began to ring, Mr. Andrade handed the receiver to Defendant and returned to the security station. (Tr. at 13.) Mr. Andrade then watched Defendant engage in a telephone conversation. (Id.)

After hanging up, Defendant approached Mr. Andrade at the security station. (Id.) Mr. Andrade told Defendant that he would not allow him to drive given his condition. (Id.) Defendant told Mr. Andrade that he had just called his sons who were coming to pick him up.

---

[1] Defendant's briefing uses the date of March 14, 2000.

(Id.)  Defendant then left the bar.  (Id.)

Mr. Andrade told the dispatch officer that he was going to follow Defendant to make sure Defendant did not drive.  (Id.)  As Mr. Andrade left the bar, an off-duty PPSC employee told Mr. Andrade that Defendant was walking towards a nearby laundromat.  (Tr. at 14.)  Mr. Andrade headed that way and arrived in time to see, from twenty-five yards away, Defendant getting into the front passenger seat of a Ford Expedition.  (Tr. 14, 23, 36.)

Mr. Andrade approached the car from the rear on the passenger's side.  (Tr. 14, 32.)  As Mr. Andrade moved closer to the car, Defendant got out.  (Tr. 14.)  Mr. Andrade asked Defendant if he was OK, to which Defendant responded affirmatively and said that he was just waiting for his sons.  (Id.)  At that point, Defendant "moved slightly," and Mr. Andrade could then see a revolver or handgun on the dashboard, within Defendant's reach.  (Id.)  Although the testimony is not clear, it appears that Mr. Andrade could not tell whether the gun on the dashboard was loaded.  (Tr. at 60.)  (It was later found to be loaded.  (Tr. at 49.))

PPSC tells its employees who perceive a threat from a person inside a vehicle to have the person step to the front of the vehicle.  (Tr. at 33.)  Mr. Andrade drew his weapon and told Defendant to move to the front of the car.  (Tr. at 14.)  Mr. Andrade did not train his weapon on Defendant but rather kept it in the "low ready position."  (Tr. at 25.)  Mr. Andrade then, for the first time, noticed a female, Dolores Romero, exiting the driver's side.  (Tr. at 14.)  Mr. Andrade had her move to the front of the car too.  (Id.)

Mr. Andrade next used his radio to call his dispatcher for back up and to request that the tribal police be alerted.  (Tr. at 15.)  PPSC employees call tribal police when intoxicated patrons refuse to cooperate, when they suspect a patron possesses a falsified resident alien card, or when

3

they suspect theft inside the casino. (Tr. at 38.) Regular calls are made to law enforcement officials from the casino and sports bar. (Tr. at 47.) Certain other individuals also call tribal police, some on a daily basis. (Tr. at 52.) Tribal police investigate all calls which they receive from any caller. (Tr. at 50-51.)

PPSC employee Paul Rodriguez was first to respond. (Tr. at 15.) When Mr. Rodriguez arrived, Mr. Andrade holstered his gun. (Tr. at 16.) Then, within one or two minutes of Mr. Andrade's radio call, PPSC employee Clyde Carter arrived. (Tr. at 16.) Within three minutes of the call, Pojoaque Pueblo Police Officer Andy Gutierrez arrived. (Tr. at 17.)

A Pojoaque Pueblo Police dispatcher had told Officer Gutierrez to respond to a scene at which an intoxicated male was in possession of a firearm. (Tr. at 40.) When he arrived Officer Gutierrez found the situation calm. (Tr. at 41.) He spoke to Mr. Andrade and Defendant, and saw the weapon on the passenger side dashboard. (Tr. at 41, 44.) Officer Gutierrez also noticed Defendant to be intoxicated by his speech, appearance, and odor. (Tr. at 46.) Officer Gutierrez asked who owned the gun and the car. (Tr. at 43-44.) Defendant said the gun was his and Ms. Romero said the car was a rental. (Tr. at 44.)[2] Officer Gutierrez asked for permission to enter the vehicle to retrieve the gun to make it safe and to check whether it was stolen. (Id.) Ms. Romero consented. (Tr. at 6, 44.) Once inside the car, Officer Gutierrez detected a strong or overwhelming odor of marijuana. (Tr. at 48-49, 53.) Officer Gutierrez then handcuffed Defendant. (Tr. at 48-49.) Officer Gutierrez testified that Defendant was at no time, even before Officer Gutierrez handcuffed him, free to leave. (Tr. at 49.)

---

[2] Although not reflected in the testimony, it appears that the vehicle was rented to Ms. Romero.

4

Defendant moves to suppress the marijuana on the grounds that those who detained him lacked a legitimate safety concern for the detention and that they also lacked probable cause to believe he had committed a crime.

**DISCUSSION**

The parties propose two scenarios. One involves Mr. Andrade as a state actor; in the other he is not. Under neither is there a Fourth Amendment violation.

I.   Andrade as a private actor

   A.   When a person is a private actor

The Fourth Amendment applies only to government agents. See Gallagher v. "Neil Young Freedom Concert," 49 F.3d 1442, 1446 (10th Cir. 1995). Thus, if Mr. Andrade was not a state agent, Defendant cannot maintain his Fourth Amendment objections to Mr. Andrade's actions.

The Tenth Circuit has recognized and applied several tests for determining whether an individual is a state actor. See id. at 1447. Under each, Defendant must prove that the conduct causing the constitutional deprivation "must be 'fairly attributable to the State.'" Id. (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

   1.   Nexus test

Under the nexus test, Defendant must show "a sufficiently close nexus between the government and the challenged conduct such that the conduct may be fairly treated as that of the State itself." Id. at 1448 (quotation omitted). The mere fact that a private entity contracts with the government or that the government acquiesces to the private party's actions does not alone satisfy the nexus test. Id. Likewise, the mere existence of a business arrangement between PPSC and Pojoaque Pueblo, or Officer Gutierrez' approval of Mr. Andrade's actions, do not create a

5

nexus with the state. In Gallagher, the Tenth Circuit held that pat-down searches by a private security firm at a concert were not transformed into state actions where the policy to search was that of the private company not that of the state university which provided the concert venue. Id. at 1450. Similarly, in this case, the policy of assuring that intoxicated patrons do not injure themselves or others was that of PPSC. The nexus test is not met.

        2.     Symbiotic relationship

This test for state action is based on Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961). In Burton the Supreme Court "held that a privately owned restaurant's refusal to serve an African-American customer constituted state action because the restaurant leased space from a parking garage owned by a state agency." Gallagher, 49 F.3d at 1451. The Tenth Circuit recognized that Burton has been tightly circumscribed and declined to find a symbiotic relationship between the state and the security service at issue in the case before it. Gallagher, interpreting Burton, indicates that the relevant inquiry is the extent to which the government benefits and is dependent upon the private entity. See id. at 1451-53. Here, as in Gallagher, the fact that the government may derive a financial benefit from the arrangement does not alone create a symbiotic relationship. Rather, to satisfy the test, the benefit must be indispensable to the government. See id. at 1453. There is no evidence of indispensability in this case. What remains is simply a service contract between a private party (a security business) and a tribal entity (a casino and sports bar) which fails to meet the Gallagher symbiotic relationship standard. See id.

        3.     Joint action

Although Defendant at no point explicitly indicates which of the four state action tests he relies upon, it appears that he argues mainly for the joint action test. However, "a shared

common goal" between the Pueblo and PPSC of a successful casino and sports bar operation does not transform Mr. Andrade into a joint state actor. Id. at 1455. Similarly, citizens whose complaints to police result in arrest are not state actors under the joint action test. See id. at 1454. Although PPSC may have a policy of calling police in certain situations, this does not change the result. Presumably most private security firms recognize their limitations and call police when appropriate. See, e.g., U.S. v. Hernandez-Cano, 808 F.2d 779, 783 (11th Cir. 1987) (finding Fourth Amendment not implicated by airport security guard who, upon seeing suspicious package, notified her supervisor who called police); Wade v. Byles, 83 F.3d 902, 904 (7th Cir. 1996) (finding security guard not a state actor where guards "would call the police" if someone refused to cooperate). As Officer Gutierrez testified, certain private citizens call the Pojoaque Pueblo Police on a daily basis, more frequently than PPSC calls them. This in no way makes any of the callers police agents.

Defendant also apparently argues that Officer Guiterrez simply relied upon the judgment of Mr. Andrade without an independent investigation, transforming Mr. Andrade into a state actor. See Gallagher, 49 F.3d at 1454 (citing Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1429 (10th Cir. 1984) (finding off-duty police officer working as security guard to be a state actor where on-duty officer made no investigation). Officer Gutierrez, however, did conduct his own investigation and did not rely solely on Mr. Andrade's detention of Defendant. That the two men worked together does not make Mr. Andrade a joint state actor.

### 4. Public function

If a government delegates to a private party a function traditionally reserved for the government, the private party becomes a state actor. See id. at 1546. Gallagher makes quite

clear that security functions are not reserved exclusively for governments, even where public property is safeguarded by a private person. See id. at 1546-47. Defendant points to no case in which a different result obtains merely because the security guard carries a gun or wears a badge. Thus, while Mr. Andrade may have performed a public function, he performed it non-exclusively and was thus not a state actor under the public function test.

      B.      Officer Gutierrez

Defendant argues that even if Mr. Andrade was a private actor, and therefore is not subject to the Fourth Amendment, Officer Gutierrez' actions violated the Constitution. There is no dispute that Officer Gutierrez had consent to enter the vehicle and Defendant does not attack that consent or any actions following it. Defendant's focus is on Officer Gutierrez' detention of Defendant from the time of Officer Gutierrez' arrival up until his entry into the car. Specifically, Defendant argues that Officer Gutierrez did not witness the misdemeanor offense on which he based Defendant's continued detention and that no legitimate safety purpose justified the continued detention.

          1.      Ms. Romero's consent

Defendant seeks to suppress the marijuana Officer Gutierrez discovered while in the car with Ms. Romero's consent. While it is well-established that evidence obtained as fruit of a poisonous tree must generally be suppressed, see, e.g., Wong Sun v. United States, 371 U.S. 471, 487-88 (1963), Defendant fails to adequately address the fact that the evidence here was the fruit of Ms. Romero's consent, not of any action by Officer Gutierrez with respect to Defendant.

          2.      Officer Gutierrez' continued detention of Defendant

Defendant never adequately explains why Officer Gutierrez' continued detention of

Defendant bears upon the evidence seized with Ms. Romero's consent.  Even if Officer Gutierrez' investigation was relevant to the inquiry, Defendant's detention during that investigation did not violate the Constitution.

In New Mexico "carrying a firearm while under the influence of an intoxicant or narcotic" is a petty misdemeanor.  NMSA 1978, 30-7-4 (A)(2), (B) (1963).  The general rule in this state is that an officer cannot make a warrantless arrest for a misdemeanor unless the offense occurs in the officer's presence.  See State v. Lyon, 103 N.M. 305 (Ct. App. 1985).  Defendant contends that since Officer Gutierrez never witnessed the crime which he describes as an arrestable offense, his arrest of Defendant was not legal.  While Defendant is correct that Officer Gutierrez did not witness any violation of section 30-7-4, that is immaterial.  Officer Gutierrez never arrested him for that offense.  Instead, Officer Gutierrez detained Defendant on the reasonable suspicion that Defendant had committed an arrestable offense and then, with consent, seized the weapon which posed a safety risk while in the possession of the intoxicated Defendant.  See King, 990 F.2d 1552, 1557.  Only after smelling marijuana did Officer Gutierrez make an arrest, which was for a drug offense.  Defendant points to no Terry-stop case law holding that police must put aside safety concerns and first ascertain the classification of a suspected crime before making, as Officer Gutierrez did, a limited investigative detention.

Moreover, far from always having to articulate a specific felony crime before a individual can be briefly detained, "police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'"  King, 990 F.2d at 1560 (quoting Cady v. Dombrowski, 413 U.S. 433, 431 (1973)).  Officer Gutierrez took

9

just this sort of caretaker action when he (1) detained Defendant who was visibly quite drunk, then (2) sought and received consent to examine the weapon that could quite reasonably be a danger in Defendant's care. Defendant would have this court close its eyes to reason by having Officer Gutierrez (1) ignore Defendant's intoxication and (2) allow Defendant to return to his seat in the car, in easy reach of a firearm, before taking action. Such a course is not required by the Constitution.

II.     Andrade as a government actor

Even if, as Defendant maintains, Mr. Andrade is a government agent, Mr. Andrade's actions did not violate the Constitution. Mr. Andrade first detained Defendant when he saw the intoxicated Defendant within reach of a firearm.[3] Without doubt Defendant was seized for Fourth Amendment purposes when Mr. Andrade drew his weapon and had Defendant move to the front of the vehicle.[4] See King, 990 F.2d at 1556. The question is whether Mr. Andrade had reasonable suspicion or probable cause to seize Defendant. Defendant relies on King.

In King the Tenth Circuit considered an officer's response to a car accident that impeded the flow of traffic. See id. at 1555. While investigating, the officer's attention was diverted by a driver honking his horn incessantly. See id. The officer approached the impatient driver who partially rolled down his window through which the officer could see a loaded weapon. See id.

---

[3] Defendant also objects to certain of Mr. Andrade's actions before Mr. Andrade saw the gun. In particular, Defendant seems to suggest that his Fourth Amendment rights were violated when Mr. Andrade failed to leave immediately upon seeing Defendant in and around the passenger's side, rather than driver's side, of the vehicle. This position is wholly without merit. See, e.g., Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000) ("An officer is free to approach people and ask questions without violating the Fourth Amendment.").

[4] Defendant does not argue that he was then under arrest.

10

Carrying a loaded weapon inside a car is legal in New Mexico.  See id.  The officer then drew her gun and ordered the defendant out of the vehicle.  See id.  The officer did not suspect the defendant of any criminal activity but rather acted out of concern for her safety and that of bystanders.  See id.

The Tenth Circuit suppressed evidence seized during a search incident to the defendant's subsequent arrest.  First, the court commented that the government's safety rationale could eviscerate the state law allowing individuals to carry loaded weapons in their cars.  See id. at 1558-59.  However, the court then found that the officer was entitled to separate the defendant from the apparently loaded pistol while she advised the defendant to stop honking, which she was also entitled to do.  See id. at 1562.  What made her actions unconstitutional was that her seizure of the defendant was not reasonably related in scope to its justification.  See id. at 1563.  The officer was entitled to order the defendant and his co-defendant from the car.  She was not, however, entitled to train her weapon on the defendant, threaten to shoot him, have other officers encircle him with guns drawn, order him to his knees, and handcuff him.  See id. at 1562.

This case is distinguishable in at least three relevant respects.  First, Mr. Andrade's actions were "reasonably related in scope to the circumstances which justified the interference in the first place."  Id. (quoting Terry v. Ohio, 392 U.S. 1, 20 (1967)).  As soon as he saw the weapon, Mr. Andrade took safety steps, permissible under King, to separate the drunken Defendant from it.  Mr. Andrade took out his own weapon but neither pointed it at Defendant nor verbally threatened him, in contrast with the officer's actions in King.  He had Defendant move away, then maintained the status quo until assistance arrived.  These facts are in sharp distinction with those in King and indicate that Mr. Andrade, even if he is a state actor, acted reasonably.

Second, Mr. Andrade had probable cause to believe Defendant violated NMSA section 30-7-4(A)(2).  In King, the Tenth Circuit explicitly acknowledged that the officer's otherwise excessive actions would have been permissible had it been illegal in New Mexico to carry loaded firearms in the passenger compartment of a car.  See King, 990 F.2d at 1563 n. 5.  Defendant's position--that he never committed an illegal act in Mr. Andrade's presence--is not persuasive.  Defendant argues that being within reach of the weapon but not physically touching it does not amount to "carrying" within the meaning of section 30-7-4(A)(2).  Article 7 elsewhere defines "carrying a deadly weapon" to mean "having it on the person, or in close proximity thereto, so that the weapon is readily accessible for use."  NMSA 30-7-1.  The New Mexico Court of Appeals has applied the definition in section 30-7-1 to the crime in section 30-7-4(A)(2) in holding that the latter is not unconstitutionally vague.  See State v. Rivera, 115 N.M. 424, 428 (Ct. App. 1993).  Although the defendant in Rivera had the weapon in his hand, and although the New Mexico Court of Appeals considered a different question, there is little doubt that a New Mexico state court would apply the section 30-7-1 definition to section 30-7-4(A)(2) in this case.  Mr. Andrade saw Defendant with the weapon in reach, i.e., in close proximity, and therefore saw Defendant negligently carry it while intoxicated.

Yet a third alternative reason why Mr. Andrade acted constitutionally was his legitimate safety concern.  Just like Officer Gutierrez, Mr. Andrade legitimately exercised his community caretaker responsibilities to separate an intoxicated person from a weapon which was not clearly unloaded.  As the Tenth Circuit recognized in King, no criminal statute is necessary to justify a non-investigatory, safety-related seizure.  See King, 990 F.2d at 1560.  While under this reasoning Mr. Andrade may have more expediently seized the gun himself rather than wait three minutes for

Officer Gutierrez to arrive, Mr. Andrade's decision to wait without doubt was "reasonably related in scope to the circumstances" which first justified the interference.  Id. at 1562.

From any angle, Defendant's Fourth Amendment rights were not violated.

IT IS THEREFORE ORDERED THAT Defendant's motion to suppress is denied.

_____
**UNITED STATES DISTRICT JUDGE**